# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| **JAMES B PATIN** | **CASE NO.  6:19-CV-00099** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **VOYA INSURANCE & ANNUITY CO ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff's Motion to Remand. (Rec. Doc. 44). Defendants, Bryan Touchet and Venerable Insurance and Annuity Company, opposed the Motion (Rec. Doc. 50), and Plaintiff replied (Rec. Doc. 53). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court. Considering the evidence, the law, and the arguments of the parties, and for the reasons explained below, the Court recommends that Plaintiff's Motion be granted.

## Factual Background

Plaintiff filed this suit in December 2018 in state court against Bryan Touchet, a financial advisor, his alleged employer, Park Avenue Securities, LLC, and

Venerable's corporate predecessors.[1] Plaintiff alleged that in December 2007, Touchet and Venerable sold an annuity to him based upon the representations that any investments during the first ten years would be ratcheted up seven percent every year during the first ten years and that Plaintiff could begin withdrawing from the annuity after ten years. (Rec. Doc. 1-2, ¶III-V). Plaintiff alleged that he made two investments in the annuity in December 2007 and January 2008. (Rec. Doc. 1-2, ¶VI). He made two additional investments in April 2016 and November 2017, respectively, following discussions with Defendants in which they confirmed the foregoing terms and conditions. (Rec. Doc. 1-2, ¶VII; Rec. Doc. 14, ¶VII, VIIA). He alleged that he discussed with Defendants his intentions to begin withdrawing from the account on the ten-year anniversary date, in December 2017, as allegedly permitted by his agreements with Defendants. (Rec. Doc. 1-2, ¶VI-IX; XII). Nevertheless, Plaintiff claims that Defendants refused to allow him to begin withdrawing from the annuity in December 2017, claiming that benefits did not accrue until Plaintiff reached the age of 59½. (Rec. Doc. 1-2, ¶X-XI).

Defendants removed the case to this Court in January 2019 on the basis of diversity jurisdiction. Park Avenue asserted that Touchet, who was, like Plaintiff, a

---

[1]    Plaintiff initially sued Voya Insurance and Annuity Company and ING USA Annuity and Life Insurance Company, which have since become Venerable. See Rec. Doc. 35. The Court shall refer to these former defendants as "Venerable."

2

Louisiana citizen, was improperly joined, because Plaintiff's claims against him are perempted under La. R.S. 9:5606. (Rec. Doc. 1). Plaintiff filed the instant Motion to Remand in February 2021.[2] Plaintiff contends that he has viable claims against Touchet, such that complete diversity does not exist. Defendants argue Plaintiff's claims against Touchet are perempted under Louisiana law and/or meritless, such that he was improperly joined.

## Law and Analysis

## I.    Law Applicable to Subject Matter Jurisdiction, Removal, and Improper Joinder.

The federal district courts have original jurisdiction over cases involving a federal question, pursuant to 28 U.S.C. §1331, and those in which the parties are diverse in citizenship and the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. §1332. Courts may also exercise, or decline to exercise, supplemental jurisdiction over certain cases. 28 U.S.C. §1367; *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.,* 485 F.3d 804, 810 (5th Cir. 2007). 28 U.S.C. §1441 and §1446 provide the procedural mechanism by which a party may remove a matter from state court to a federal district court.

---

[2]    In the meantime, Park Avenue filed a Motion to Stay and Compel Arbitration (Rec. Doc. 15), and Touchet filed a F.R.C.P. Rule 12(b)(6) Motion to Dismiss (Rec. Doc. 27), both of which are stayed pending this ruling.

Under 28 U.S.C. § 1441(a), any state court civil action over which the federal courts would have original jurisdiction may be removed from state to federal court. When original federal jurisdiction is based on diversity, a defendant may remove only "if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." §1441(b). Generally, upon the filing of a motion to remand, the removing party bears the burden to prove that federal jurisdiction exists. *De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1408 (5th Cir. 1995).

In this case, Defendants contend that Touchet, a non-diverse defendant, was improperly joined. "When a defendant removes a case to federal court on a claim of improper joinder, the district court's first inquiry is whether the removing party has carried its heavy burden of proving that the joinder was improper." *Smallwood v. Illinois Cent. R. Co.,* 385 F.3d 568, 576 (5th Cir. 2004) (en banc). "To demonstrate improper joinder of resident defendants, the removing defendants must demonstrate either: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court. *Gasch v. Hartford Acc. & Indem. Co.,* 491 F.3d 278, 281 (5th Cir. 2007), quoting *Crockett v. R.J. Reynolds Tobacco Co.,* 436 F.3d 529, 532 (5th Cir.2006). Defendants in this case do not contend actual fraud in the pleadings. Rather, Defendants rely upon the second category of improper removals. As such, the

4

threshold question is whether "there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Id*. citing *Smallwood, supra.* In deciding whether a party was improperly joined, the court must resolve all contested factual issues and ambiguities of state law in favor of the plaintiff. *Id*. citing *Guillory v. PPG Indus., Inc.,* 434 F.3d 303, 308 (5th Cir.2005).

While the court has discretion to "pierce the pleadings and consider summary judgment-type evidence in the record" in determining whether joinder was improper, it "must also take into account all unchallenged factual allegations, including those alleged in the complaint, in the light most favorable to the plaintiff." *McKee v. Kan. City S. Ry. Co*., 358 F.3d 329, 334 (5th Cir.2004) (citing *Travis,* 326 F.3d at 648-49.). Thus, "although the type of inquiry into the evidence is similar to the summary judgment inquiry, the district court is not to apply a summary judgment standard but rather a standard closer to the Rule 12(b)(6) standard." *Id.* Any contested issues of fact and any ambiguities of state law must be resolved in the plaintiff's favor. *Id*. Finally, the Court "must also take into account the 'status of discovery' and consider what opportunity the plaintiff has had to develop its claims against the non-diverse defendant." *Id.* at 334-36; *see also Travis*, 326 F.3d at 650-51 (noting that when discovery was ongoing "simply pointing to the plaintiff's lack of evidence at stage of the case is insufficient" to establish improper joinder). At this stage of the

litigation Plaintiff is not expected to produce evidence sufficient to survive a motion for summary judgment; he must only show a "reasonable basis for the [] court to predict that the plaintiff might be able to recover." *Smallwood*, 385 F.3d at 573; *see also Guillory v. PPG Indus., Inc*., 434 F.3d 303, 308–09 (5th Cir.2005) (explaining "[w]e do not determine whether the plaintiff will actually or even probably prevail on the merits of the claim, but look only for a possibility that the plaintiff might do so").

## II.    Whether Plaintiff's claims against Touchet are perempted.

Defendants contend that Touchet was improperly joined, because Plaintiff's claims against him are time-barred under La. R.S. 9:5606. That statute provides that all claims against insurance agents[3] must be brought within one year from the alleged act or omission or from the date the alleged act or omission was discovered. In addition, claims against insurance agents are subject to a three-year peremptive period. La. R.S. 9:5606(A). Under Louisiana law, a peremptive period is a period of time fixed by law for the existence of a right, which, unless timely exercised, is extinguished. La. C.C. art. 3458. See also La. R.S 9:5606(A), mandating that the one- and three-year periods are peremptive and may not be renounced, suspended, or interrupted.

---

[3]    The parties do not appear to dispute that La. R.S. 9:5606 applies to Touchet.

6

### A. Whether Plaintiff's claims against Touchet based on alleged 2016 and 2017 communications are perempted.

Defendants argue that, because Plaintiff asserts that Touchet made the alleged misrepresentations in 2007, his claims are expired. Claims arising out of the alleged 2007 misrepresentations are obviously perempted by La. R.S. 9:5606. Instead, Plaintiff relies upon his allegations that Touchet made additional misrepresentations during discussions in April 2016 and November 2017. Thus, Plaintiff submits, the peremptory periods for these alleged misrepresentations did not expire until at least April 2019, such that Plaintiff's December 2018 suit was timely.

The parties' contentions regarding Touchet's alleged 2016 and 2017 misrepresentations require the Court to classify the alleged misrepresentations as a series of continuing torts, or, alternatively, separate torts. If the alleged 2016 and 2017 misrepresentations constitute continuing torts, they do not operate to extend the peremptive period, because the doctrine of continuing torts does not apply to peremptive periods. *Bel v. State Farm Mut. Auto. Ins. Co.*, 2002-1292 (La. App. 1 Cir. 2/14/03), 845 So. 2d 377, 382, *writ denied,* 2003-0733 (La. 5/30/03), 845 So. 2d 1057. If the alleged 2016 and 2017 misrepresentations constitute separate torts, the peremptive period began anew with each separate act.

"In order for each renewal to be the basis of a separate tort, the complained of conduct must consist of separate and distinct acts, each of which gives rise to immediately apparent damages." *Bel*, 845 So.2d at 382, citing *Bustamento v. Tucker,*

607 So.2d 532, 540 (La.1992). In reviewing judicial interpretation of agents'
conduct under La. R.S. 9:5606, the Louisiana First Circuit Court of Appeals
summarized as follows:

> The question of whether alleged acts or omissions of an
> insurance agent constitute separate torts has arisen in the context of
> policy renewals, where the failure to procure certain coverage is
> repeated with each subsequent renewal. In this context, the courts have
> concluded that where there is no contact between the agent and the
> insured subsequent to issuance of the original policy, the mere renewal
> of a policy will not constitute a separate tort. However, the agent may
> commit a separate tort subsequent to the original issuance of the policy
> where the agent subsequently discusses coverage with the client prior
> to or at the time of renewal.
>
> *State ex rel. Div. of Admin., Off. of Risk Mgmt. v. Nat'l Union Fire Ins.
> Co. of Louisiana*, 2007-1134 (La. App. 1 Cir. 2/8/08), 984 So. 2d 91,
> 95, *writ denied,* 2008-0548 (La. 4/25/08), 978 So. 2d 370.

See further e.g. *Bel, supra* (agent did not have occasion to misrepresent the
nature of uninsured motorist coverage after the plaintiff executed the UM rejection
form, which remained effective with each renewal); *Rowe v. Primerica Life Ins. Co.,*
No. CV 19-863-SDD-SDJ, 2020 WL 5658201, at *6 (M.D. La. Sept. 23, 2020) (The
court found no separate acts where the complaint was "devoid of any factual
allegation even referencing any annual renewals or communication.") Compare e.g.
*Sonnier v. Louisiana Farm Bureau Mut. Ins. Co.,* 2005-1006 (La. App. 3 Cir.
3/1/06), 924 So. 2d 419, 422, *writ denied,* 2006-0704 (La. 5/26/06), 930 So. 2d 33
(Agent erroneously advised plaintiffs each time they sought renewal that a particular
coverage was not available.); *Fid. Homestead Ass'n v. Hanover Ins. Co.,* 458 F.

Supp. 2d 276, 280 (E.D. La. 2006) (Allegations that agent met with the plaintiff at least once a year supported the possibility of separate torts.)

The Court agrees that the alleged facts of this case support a finding that Touchet's alleged 2016 and 2017 misrepresentations constituted separate and distinct acts. Plaintiff alleges that he discussed the terms and conditions during April 2016 and November 2017 meetings with Touchet. Thus, under the latter line of the above-cited cases, the Court finds that Plaintiff's claims arising out of the alleged 2016 and 2017 misrepresentations constitute separate torts and are not perempted under 9:5606.

## B. Whether Plaintiff's claims against Touchet accrued in 2016 and/or 2017.

Defendants next contend that Plaintiff's claims against Touchet are perempted under La. R.S. 9:5606, because he did not file suit within one year of when he should have known about the alleged misrepresentations. Defendants submitted the following evidence:[4] 1) the 2007 prospectus which purportedly provides that the withdrawal benefit did not commence until Plaintiff reached the age of 59½ (Rec. Doc. 27-5 p. 28-30); 2) Plaintiff's signed application wherein he acknowledged receiving the prospectus when he purchased the annuity in December 2007 (Rec. Doc. 27-3, p.7); and 3) the April 2016 and April 2017 prospectuses which

---

[4]    Defendants submitted this evidence in support of their separately filed Motion to Dismiss.

purportedly provide that the benefit did not accrue until Plaintiff reached the age of 59½. (Rec. Doc. 27-6, p. 17; 27-7, p. 9; 27-8, p. 20; 24). Defendants argue that receipt of these prospectuses placed Plaintiff on notice that Touchet's statements allegedly differed from the terms of the annuity, thereby triggering the peremptive period. Plaintiff denies receipt of the prospectuses and further contends that the prospectuses did not clearly put him on notice of the alleged discrepancies.

In *Rowten v. Wall Street Brokerage, LLC*, the Fifth Circuit considered a plaintiff investor's claim that her broker misrepresented the terms of an investment. In determining whether the plaintiff's claims were prescribed, the court explained:

> Recognizing the inherent risk in financial investments, courts require an investor seeking to blame his investment loss on fraud or misrepresentation [to] ... exercise due diligence to learn the nature of his investment and the associated risks. This means that an investor cannot close his eyes and simply wait for facts supporting [his] claim to come to his attention. Anchoring this principle is the recognition that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

> *Rowten v. Wall St. Brokerage, L.L.C.,* 646 F. App'x 379, 381–82 (5th Cir. 2016) (internal quotes and citations omitted).

As in this case, the *Rowten* defendants argued the plaintiff should have been on notice of statements in the investment prospectus indicating that the investment was not guaranteed as the plaintiff claimed. Also as in this case, the *Rowten* plaintiff argued that she had not received the prospectus. In rejecting the plaintiff's arguments, the court reasoned:

10

This case is resolved by determining when the statute of limitations began to run on the Rowtens' claims, all of which are subject to a four-year statute of limitations. "The controlling date for purposes of the running of the respective statutes of limitations is when a purchaser of securities knew—or in the exercise of reasonable diligence, should have known—of the alleged wrongdoing." "If a reasonable person would inquire further, a plaintiff must proceed with a reasonable and diligent investigation of the facts the plaintiff has learned and is charged with the knowledge of all facts such an investigation would have disclosed."

Rowten signed the Subscription Agreement on September 17, 2008. The Defendants contend that, through reasonable diligence, the Rowtens could have discovered their claims on that date. It is undisputed that, on that date, Rowten signed that she had received and agreed to be bound by the terms of the Prospectus, which clearly contradict any allegations that her investment was guaranteed. Although there is a fact issue whether Rowten actually received the Prospectus, the Defendants assert that her signing the Subscription Agreement that contained repeated references to the Prospectus and agreeing to be bound by its terms constitute "storm warnings" that would have caused a reasonably diligent investor to inquire further before investing. They specifically contend that a reasonable investor would have obtained and read the Prospectus, and therefore would have learned of the Defendants' misrepresentations. We agree.

*Id*. at 382 (citations omitted).

As in *Rowten*, the controlling date under La. R.S. 9:5606 is when Plaintiff should have discovered the alleged actions, omissions, or neglect. *White v. Allstate Ins. Co.,* 513 F. Supp. 2d 674, 682 (E.D. La. 2007). The evidence supports that Plaintiff received a copy of the 2007 prospectus purportedly indicating that benefits did not accrue until he reached the age of 59½. Thus, he was *potentially* on notice at

that time of Touchet's alleged misrepresentations, though, as previously discussed, claims arising out of 2007 statements are perempted.

As discussed above, the alleged 2016 and 2017 misrepresentations constituted separate and distinct torts for which the peremptive period began anew. Defendants did not submit evidence that Plaintiff received the 2016 and 2017 prospectuses. Nonetheless, the Fifth Circuit has suggested, though not definitively held, that a plaintiff may be on constructive notice of prospectuses properly filed with the Securities and Exchange Commission (SEC) and made publicly available. *Miller v. Nationwide Life Ins. Co.,* 391 F.3d 698, 700 (5th Cir. 2004), citing *Eckstein v. Balcor Film Investors,* 58 F.3d 1162, 1169 (7th Cir.1995). The 2007, 2016, and 2017 prospectuses were properly filed with the SEC and are publicly available.[5] See also *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 901 (E.D. La. 2014), quoting *In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 864 (N.D.Cal.2004) ("[T]he court may take judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements."). Thus, even if Plaintiff proves that

---

[5]    https://www.sec.gov/Archives/edgar/data/836687/000083668707000226/final.htm;
https://www.sec.gov/Archives/edgar/data/836687/000083668716000207/registrationstatement.htm;
https://www.sec.gov/Archives/edgar/data/836687/000083668717000023/esiietalforbcl.htm.

12

he did not receive the 2016 and 2017 prospectuses, he may be held to have had constructive notice of the contents of the prospectuses by virtue of their public availability. However, this conclusion does not resolve whether the prospectuses would have put Plaintiff on notice of Touchet's alleged misrepresentations.

Plaintiff argues that the prospectuses did not clearly advise that Touchet's representations were false or that Plaintiff was prohibited from collecting benefits until he reached 59½. The Court reiterates the standard of notice: "If a reasonable person would inquire further, a plaintiff must proceed with a reasonable and diligent investigation of the facts the plaintiff has learned and is charged with the knowledge of all facts such an investigation would have disclosed." *Rowten*, 646 F. App'x 379, 382, citing *Bodenhamer v. Shearson Lehman Hutton, Inc.,* No. 92–2392, 1993 WL 277033, at *2 (5th Cir. July 14, 1993) (unpublished).

The 2007 prospectus establishes the Guaranteed Withdrawal Status, which "begins on the date of the first withdrawal, ONLY IF the quarterly contract anniversary following the annuitant reaching age 59½ has not yet passed." (Rec. Doc. 35-1, p. 20-21) (emphasis in original). The 2007 prospectus also establishes the Automatic Periodic Benefit Status, which entitles the annuitant to receive periodic payments if the contract value is reduced to zero, subject to certain conditions, beginning "on the last day of the first full Contract year following the date the rider enters Automatic Periodic Benefit Status." (Rec. Doc. 35-1, p. 23-24).  There is also

13

the Lifetime Automatic Periodic Benefit Status (which does not explicitly mention the 59½ age qualification) and the Lifetime Guaranteed Withdrawal Status (which begins on the date of the first withdrawal, provided the quarterly contract anniversary following the youngest active spouse's 65th birthday has passed[, but i]f the first withdrawal is taken prior to this date, then the Lifetime Guaranteed Withdrawal Status will automatically begin on the quarterly contract anniversary following the youngest active spouse's 65th birthday."). (Rec. Doc. 35-1, p. 23-30).

The 2016 prospectus establishes the Lifetime Withdrawal Phase (which begins on the date of the annuitant's first withdrawal… "SO LONG AS[6] the annuitant is aged 59½.") and the Lifetime Automatic Periodic Benefit Status (which occurs when the contract value is reduced to zero and entitling the annuitant to receive periodic annual payments rather than allowing the annuitant to make withdrawals). (Rec. Doc. 27-5, p. 15-16; 23-24). Further, "In the event the contract value is reduced to zero before the Lifetime Withdrawal Phase begins, Lifetime Automatic Periodic Benefit Status is deferred until the contract anniversary on or after the annuitant is age 59½" (Rec. Doc. 27-5, p. 16). The prospectus summarizes that the contract "guarantees an amount available for withdrawal…in any contract year once the Lifetime Withdrawal Phase begins." (Rec. Doc. 27-5, p. 21; 24). There

---

[6]     Emphasis in original.

14

is also the Guaranteed Withdrawal Status (which "begins on the date of the first withdrawal, ONLY IF the quarterly contract anniversary following the annuitant reaching age 59½ has not yet passed") and the Lifetime Guaranteed Withdrawal Status (which "begins on the date of your first withdrawal, provided the quarterly contract anniversary following the annuitant's age 59½ has passed[, but i]f your first withdrawal is taken before this date, then the Lifetime Guaranteed Withdrawal Status will automatically begin on the quarterly contract anniversary following the annuitant reaching age 59½."). (Rec. Doc. 27-5, p. 28-29). The 2017 prospectuses contain the same provisions. (Rec. Doc. 27-8, p. 11-12; 19-20; 24). Plaintiff also executed an Explanation of Investment Variable Annuity form in which he acknowledged that he understood that "an IRS penalty may be applied to withdrawals prior to age 59½[…and] in view of these charges, that the limited liquidity associated with this product is acceptable given my personal circumstances." (Rec. Doc. 27-4).[7]

The Court agrees with Plaintiff that the foregoing language is certainly not a picture of clarity. The 2007 prospectus, the only one which the record confirms Plaintiff received, is murkier than the more recent prospectuses, of which there is no

---

[7]     The form is dated January 19, 2007, though this could have been an error. Plaintiff alleged in his petition that he made an additional investment in January 2008. See Rec. Doc. 1-2, ¶VI.

15

evidence that Plaintiff received. Assuming that Plaintiff is nevertheless deemed to have knowledge of the 2016 and 2017 prospectuses, the question is whether these documents were sufficient to raise Plaintiff's suspicions of an age caveat precluding his withdrawals after ten years.

In *Greening v. Western Reserve Life*, the court found that "the facts and provisions contained in the prospectuses and contracts were reasonably knowable to plaintiffs." *Greening v. W. Rsrv. Life Assur. Co. of Ohio*, 439 F. Supp. 2d 612, 614 (M.D. La. 2006). The court relied on a Seventh Circuit case, *Securities & Exchange Commission v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998) ["over and over again we say that people claiming to be victims of securities fraud may not claim to rely on oral statements inconsistent with written documents (even tedious prospectuses) available to them."

Plaintiff argues that Touchet's alleged misrepresentations "lulled him into complacency" in believing that he could begin withdrawals from the annuity after ten years. Several cases support the proposition that outstanding factual issues regarding whether a plaintiff was lulled into complacency by an agent's misrepresentation warrants remand. See e.g. *White,* 513 F. Supp. 2d at 682, wherein the court found: "Without further factual development, the Court cannot determine whether Plaintiffs ever received a copy of their policy... Additionally, the Court is unable to determine, absent further factual development, whether the [the plaintiffs]

16

were "lulled into complacency by representations made by [the agent]."). See also *Fid. Homestead.,* 458 F. Supp. 2d at 280–81 (Without further factual development, the court could not determine whether the plaintiff was "lulled into complacency" by the agent's representations.). However, these cases are distinguishable from those which support Defendants' position, such as *Greening*, *supra*, and *Martinez Tapia v. Chase Manhattan Bank, N.A.,* 149 F.3d 404, 409 (5th Cir. 1998). The former cases address the plaintiffs' purchase of insurance; whereas, the latter cases rely on the investor's duty to investigate, which is triggered by knowledge of an investment contract's contents.

An investment may be generally regarded as a more sophisticated endeavor than an ordinary insurance purchase, and investors may generally be considered more sophisticated than an individual buying insurance (a task which most individuals will encounter at some point). Nonetheless, the Court cannot say that an investor, even a sophisticated one, is automatically held to *understand* unclear language in the prospectus he receives. An investor could conceivably be exercising his duty to investigate by asking questions of the one deemed most knowledgeable – the agent. Given the convoluted verbiage of the prospectuses in this case, it is at least possible that Plaintiff appropriately exercised his duty to investigate by discussing the terms of the annuity with Touchet, and, upon receiving a response that did not appear to obviously conflict with the prospectuses, proceeding with the

purchase, then becoming aware at the time of his first attempted withdrawal that the terms were not as interpreted. Defendants contend the 2016 and 2017 prospectuses clearly state that Lifetime Guaranteed Withdrawal Status did not commence until Plaintiff reached 59½, citing Rec. Doc. 27-5, p. 28-29. However, absent further factual development, it is unclear that Plaintiff expected to obtain Lifetime Guaranteed Withdrawal Status after ten years, given the possibility of other statuses and phases established by the annuity.

The Court's finding is limited to the facts of this case, where the language of the prospectuses do not clearly preclude the possibility that Plaintiff was permitted to withdraw from the annuity after ten years, though perhaps with some penalty or preclusion of benefits, the likes of which are not clear to this Court. In short, factual issues remain about whether the documents clearly put Plaintiff on notice of Touchet's alleged misrepresentations. Considering that factual allegations must be evaluated in the light most favorable to the plaintiff and that all factual issues must be resolved in the plaintiff's favor, the Court finds there is a reasonable basis to predict that Plaintiff might be able to recover against Touchet for claims arising out of the alleged 2016 and 2017 misrepresentations. Thus, remand is proper. See *White*, 513 F. Supp. 2d at 682 (factual discrepancies regarding whether the plaintiff received a copy of their insurance policy sufficient to put them on notice of their claim warranted a finding of proper joinder and remand to state court). See also *McKee*,

358 F.3d at 333-36 (discussing the propriety of remand where the facts showed the possibility of a valid cause of action) and *Travis*, 326 F.3d at 650 (discussing that discovery could reveal a possible cause of action against the non-diverse defendant, warranting remand).

### III.    Whether Plaintiff's assert a viable claim for negligence against Touchet.

Defendants last urge the Court to find that Touchet was improperly joined on the grounds that Plaintiff's negligent misrepresentation claims against him fail as a matter of law. Defendants rely upon the doctrine of detrimental reliance. "Detrimental reliance is a doctrine designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." *Simmons, Morris & Carroll, LLC v. Cap. One, N.A.,* 49,005 (La. App. 2 Cir. 6/27/14), 144 So. 3d 1207, 1215, *writ denied,* 2014-1900 (La. 11/14/14), 152 So. 3d 886. A detrimental reliance claim requires proof of a representation by word or conduct, justifiable reliance on the representation, and a change in position to one's detriment because of the reliance. *Id*. citing *Suire v. Lafayette City–Parish Consol. Government,* 2004–1459 (La.4/12/05), 907 So.2d 37. "[B]oth negligent misrepresentation and detrimental reliance claims require justifiable reliance by the claimant on the (mis)representation by the defendant in order to recover." *Id*.

Defendants argue Plaintiff could not reasonably have relied on Touchet's alleged statements when the prospectuses clearly stated that benefits could not be

withdrawn until the age of 59 ½. Plaintiff urges the Court to consider the unresolved factual issues, such as whether he received the prospectuses and whether the prospectuses clearly placed him on notice of Touchet's alleged misrepresentations. The Court agrees for the same reasons, discussed above, that outstanding factual issues preclude the Court from determining when Plaintiff was on notice of the alleged misrepresentations.

## Conclusion

For the reasons discussed herein, the Court recommends that Plaintiff's Motion to Remand (Rec. Doc. 44) be GRANTED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds

of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 7th day of April, 2021.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**